**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| SHAWN VAN ASDALE, an individual, and LENA VAN ASDALE, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>INTERNATIONAL GAME, TECHNOLOGY a Nevada corporation,<br><br>Defendants. | 3:04-CV-703-RAM<br><br>**ORDER** |

Before the court is a Motion For Summary Judgment by Defendant International Game Technology (Doc. #173).[1] Plaintiffs have opposed (Doc. #177), and Defendant has replied (Doc. #183). After a thorough review, the court finds that the motion should be granted in part and denied in part.

## I. BACKGROUND

Plaintiffs Shawn and Lena Van Asdale[2] are former corporate counsel for Defendant, International Game Technology (IGT). (Pls.' Compl. 4 (Doc. #3).) Plaintiffs bring this action against Defendant for their dismissals, which they allege were done in retaliation for Plaintiffs' protected activity of reporting suspected IGT shareholder fraud to federal authorities. (*Id.* at 3.) Plaintiffs' complaint alleges that Defendants are liable to them under the Sarbanes-Oxley Act (SOX) and for the Nevada state torts of tortious discharge, intentional interference with contractual relations, and intentional infliction of emotional distress. (*Id.* at 14-20.) Plaintiff

---

[1] Refers to the court's docket number.

[2] The court will refer to the Van Asdales collectively as Plaintiffs and individually by their first names.

Lena Van Asdale also alleges that Defendant is liable to her for retaliation. (*Id.* at 19.)

Defendant is a Nevada corporation with its principal place of business in Reno, Nevada. (*Id.* at 3.) Defendant specializes in the design, development, manufacturing, distribution and sales of computerized gaming machines and systems products. (Def.'s Mot. for Summ. J. 2 (Doc. #173).) Defendant hired both Shawn and Lena Van Asdale in January 2001 to work as in-house intellectual property attorneys. (*Id.*) Both Plaintiffs are attorneys licensed in Illinois. (Def.'s Mot. for Summ. J., Campbell Dec., Ex. 1 at 13, Ex. 2 at 13-14.) Neither is licensed in any other jurisdiction, including Nevada. (*Id.*) The alleged events giving rise to this action took place in Nevada. (Pls.' Compl. 3.)

The court derives jurisdiction in this case from the federal question at issue under the Sarbanes-Oxley statute. (Pls.' Compl. 3.) On June 13, 2007, this court entered an order granting Defendant's motion for summary judgment as to Plaintiffs' federal claim under the Sarbanes-Oxley Act and dismissing Plaintiffs' state law claims without prejudice. (Doc. #197.) On appeal, the Ninth Circuit reversed the grant of summary judgment as to Plaintiffs' federal claim, vacated the dismissal of the state law claims, and remanded for this court to address, in the first instance, Defendant's motion for summary judgment as to the state law claims. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1005 (9th Cir. 2009).

In 2001, IGT began merger negotiations with Anchor Gaming (Anchor). (Pls.' Compl. 4). Plaintiffs allege that top management at Anchor stood to make millions of dollars, personally, if IGT acquired Anchor by merger. (*Id.* at 1). Plaintiffs allege that the merger was "based primarily on Anchor's 'Wheel of Gold' patents" (the Wheel patents). (*Id.*) After the merger, IGT acquired a third Wheel patent, the '000 patent. (*Id.* at 2.) IGT planned to litigate against Bally Gaming as soon as the '000 patent issued. (*Id.*) According to Plaintiffs, Anchor withheld vital information about the Wheel patents from IGT and from IGT's Intellectual Property department. (*Id.*) Specifically, Plaintiffs allege that Anchor withheld information about the "Australian Flyer," a document that would have apparently showed the Wheel patents to be worthless. (*Id.* at 2-3.) Plaintiffs claim that when the Australian Flyer was

2

eventually revealed by Anchor's former patent counsel, IGT terminated its litigation against Bally Gaming because the flyer revealed the invalidity of the '000 patent. (*Id* at 3.) Plaintiffs allege that they both met with Dave Johnson, General Counsel for IGT, to express their view on the invalidity of the '000 patent and to express concern that fraud had occurred. (*Id.* at 10.) Plaintiff Shawn Van Asdale alleges that he also engaged in other protected whistleblowing activity when he discussed this same issue with Sara Beth Brown, the former General Counsel for IGT, and Richard Pennington, another IGT executive. (*Id.* at 9.)  Both Plaintiffs were subsequently terminated, allegedly in retaliation for their whistleblowing activities. (*Id.* at 11-12.)

## II. LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute over the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (citing Fed.R.Civ.P. 56©).  Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials of the pleadings,

but must set forth specific facts showing there is a genuine issue for trial. *Anderson,* 477 U.S. at 248. Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56©.

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson*, 477 U.S. at 248. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

### III. DISCUSSION

#### A.   ISSUES DECIDED BY THE NINTH CIRCUIT

On appeal, the Ninth Circuit addressed Defendant's arguments that (1) Plaintiffs are prohibited from maintaining this action under their ethical obligations as Illinois-licensed attorneys and (2) notwithstanding the particular requirements of Illinois law, Plaintiffs' case should not go forward because they cannot establish their claim without using attorney-client privileged information. *Van Asdale,* 577 F.3d at 994. The Ninth Circuit rejected both arguments, concluding that dismissal of Plaintiffs' claims on either ground was not warranted. *Id.* at 994-96.

#### B.   TORTIOUS DISCHARGE CLAIMS

Plaintiffs' assert they were wrongfully discharged by Defendant for internally reporting and refusing to participate in alleged illegal conduct. (Pls.' Compl. 15-17.) Defendant argues that it is entitled to summary judgment on Plaintiffs' tortious discharge claims because

Plaintiffs failed to externally report the alleged illegal activity as required by Nevada law. (Def.'s Mot. for Summ. J. 23.) Because the claims for tortious discharge for Shawn and Lena are based on nearly identical facts, the court will address both Plaintiffs' claims together.

Employment contracts are presumed to be at-will under Nevada law. *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 884-45 (Nev. 1999). An employer "may discharge an employee for any reason, so long as the reason does not violate public policy." *Id.* at 885. Nevada recognizes the tort of retaliatory discharge in the whistleblowing context when an at-will employee is fired for reporting illegal conduct of his employer because termination for reporting illegality violates an established public policy of the state. *Wiltsie v. Baby Grand Corp.*, 774 P.2d 432, 433 (Nev. 1989). In *Wiltsie*, the Nevada Supreme Court upheld the district court's grant of summary judgment where a poker room manager was terminated for reporting alleged illegal activity to his supervisor. *Id.* at 433-34. The court stated that "[s]o long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged." *Id.* at 433 (citation and quotation omitted). In finding that the poker room manager did not have a cause of action for retaliatory discharge, the court held that "[b]ecause [he] chose to report the activity to his supervisor rather than the appropriate authorities, he was merely acting in a private or proprietary manner." *Id.* Therefore, an employee must expose an employer's illegal activity to the proper authorities, not merely to a supervisor, to be entitled to protection for whistleblowing.

Plaintiffs concede that they did not report wrongdoing to anyone outside of IGT. (Pls.' Opp. to Summ. J. 36 (Doc. #177).) Nevertheless, Plaintiffs argue that they have a viable claim for tortious discharge, even if illegality is only internally reported, where their objection amounts to a refusal to violate public policy. *Id.*

A claim for tortious discharge is available "to an employee who was terminated for refusing to engage in conduct that he, in good faith, reasonably believed to be illegal." *Allum v. Valley Bank*, 970 P.2d 1062, 1068 (Nev. 1998). However, "mere objection to company

policies is not sufficient to support such a tortious discharge claim." *Bielser v. Prof'l Sys. Corp.*, 321 F. Supp. 2d 1165, 1171 (D. Nev. 2004). Rather, an employee must take some action amounting to "a refusal to violate the public policy of [Nevada]." *Id.* (quoting *Bigelow v. Bullard*, 901 P.2d 630, 634 (Nev. 1995)). In *Bielser*, the court noted the distinction between a cause of action for tortious discharge resulting from whistleblowing activity and a cause of action for tortious discharge resulting from a refusal to violate public policy. *Bielser*, 321. F.Supp. 2d 1171. In the former, an employee "merely discovers that her employer is engaged in illegal conduct and reports it to someone," while in the latter, "an employee is asked by her employer to participate in conduct violative of public policy." *Id.* The court in *Bielser* concluded that a general manager's claim for tortious discharge resulting from her internal reporting of allegedly fraudulent and illegal overcharging of a client was "based on whistleblowing, not a refusal to violate public policy." *Id.* at 1166, 1171. The court found that the general manager's behavior in bringing the allegedly fraudulent activity to her employer's attention and voicing an objection to the conduct did not amount to a refusal to engage in the fraudulent conduct herself. *Id.* at 1171.

Here, Plaintiffs' actions closely resemble the actions taken by the general manager in *Bielser*. Plaintiffs met with Dave Johnson to discuss and explain to him their views on the invalidity of the '000 patent on November 24, 2003. (Def.'s Mot. for Summ. J., Campbell Dec., Ex. 1 at 84-86, Ex. 2 at 286-91.) Plaintiffs told Johnson about the "suspicious circumstances" surrounding the discovery of the documents containing the "Australian Flyer" that appeared to indicate that the documents may have been withheld prior to the merger between Anchor and IGT. (*Id.*) Shawn told Johnson he believed an investigation for potential fraud was necessary. (*Id.*) According to Plaintiffs, Johnson responded that he would think about the situation and that he thought it was unbelievable that Mark Hettinger, the head of Anchor's IP Department before the merger, had not received nor looked at the documents. *Id.* Following the November 24 meeting, Shawn again met with Johnson and asked how the board had responded to the news of the previously undisclosed documents and the potential invalidity of

the Wheel patents. (Def.'s Mot. for Summ. J., Campbell Dec., Ex. 2 at 291.) Shawn alleges that Johnson responded that he did not tell the board about the news because the board did not need to know or be concerned about it. (*Id.* at 292.) In early January 2004, Shawn reiterated to Johnson his belief that an investigation was warranted. (Pls.' Opp. to Summ. J., Ex. C at 302.)

Plaintiffs allege that they refused to cooperate in Johnson's cover-up and pressed for an investigation. (Pls.' Opp. to Summ. J. 36.) Despite Plaintiffs' efforts to cast their actions as a refusal to violate public policy, like the plaintiff in *Bielser*, their behavior constitutes whistleblowing. Nothing in the record indicates that Plaintiffs received a directive from Johnson that they refused to follow. Rather, Plaintiffs simply brought their concerns regarding allegedly illegal activity to Johnson's attention. As noted above, because Plaintiffs only reported alleged illegality internally, and not externally to authorities, they cannot maintain a cause of action for tortious discharge resulting from whistleblowing. Plaintiffs argue that if the Nevada Supreme Court were presented with the proper case today, there is little reason to believe that it would not overrule *Wiltsie*. (*Id.* at 37.) However, this court is obligated to apply the law of Nevada's highest court, and the law under *Wiltsie* is clear – external reporting is required to sustain a cause of action for tortious discharge resulting from whistleblowing. *Bielser*, 321 F.Supp. at 1172. Thus, Defendant is entitled to summary judgment on Plaintiffs' second and third claims for relief.

**C.    INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS CLAIMS**

Plaintiffs both assert that Defendant intentionally interfered with employment contracts they entered into after their terminations. (Pls.' Compl. 18-19.) To establish a claim for intentional interference with contractual relations, a plaintiff must show: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev. 1989).

/ / /

1. <u>Shawn Van Asdale</u>

Plaintiff Shawn Van Asdale alleges that Defendant intentionally interfered with his contractual arrangement for employment with Action Gaming, causing him to be precluded from earning a living. (Pls.' Compl. 18.) Defendant contends that it is entitled to summary judgment because Shawn cannot produce any admissible evidence of the alleged interference. (Def.'s Mot. for Summ. J. 26.)

Following his termination at IGT, Shawn signed an employment agreement with Action Gaming with a prospective start date of August 1, 2004. (Pls.' Compl. 18; Pls.' Opp. to Summ. J., Ex. C at 410.) Shawn alleges that one or more individuals from IGT contacted Ernie Moody, the President of Action Gaming, and persuaded him not to employ or do business with Shawn. (*Id*.) Shawn testified at his deposition that Ernie Moody told him that "Chuck Matthewson [from IGT] had called [Ernie] … and told Ernie that he should not do business with [Shawn] and asked him not to do business with [Shawn]." (Pls.' Opp. to Summ. J., Ex. C. at 410-11.) Shawn alleges that because of the communications between Moody and individuals at IGT, Moody unilaterally delayed Shawn's start date and changed the terms of his employment agreement. (*Id*. at 38.) According to Shawn, Moody wanted to add a "no-fault termination" provision. (*Id*., Ex. C at 412.) Shawn never undertook employment at Action Gaming. (*Id*. at 38.)

Defendant argues that Shawn fails to establish that it intentionally acted or designed to disrupt his contractual relationship with Action Gaming. (Def.'s Mot. for Summ. J. 26). Specifically, Defendant contends that Shawn's deposition testimony is double hearsay and may not be considered on a motion for summary judgment. (*Id*.)

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801 (internal quotations omitted). Under the hearsay rule, a hearsay statement is generally not admissible and may not be considered on a motion for summary judgment. Fed. R. Evid. 802; *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 n.4 (9th Cir. 1995).

When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule. *United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997).

Shawn's deposition testimony pertaining to Matthewson contacting Moody is hearsay within hearsay. Shawn argues that the statement from Matthewson to Moody is admissible under Fed. R. Evid. 801(d)(2) as a statement made by a representative of Defendant and offered against Defendant. (Pls.' Opp. to Summ. J. 38.) Even if Matthewson's statement to Moody is within Fed. R. Evid. 801(d)(2), Shawn's testimony recounting what Moody said to him is also hearsay. Shawn fails to point to any exemption or exception to the hearsay rule that renders Moody's statement to him admissible. Defendant correctly asserts that Shawn is unable to produce admissible evidence to show a genuine issue of material fact to support a claim of intentional interference with contractual relations.

Moreover, Shawn fails to show he suffered any actual damages because of the changes Moody made to the terms of the employment agreement. Even if Shawn could show that IGT contacted Moody and as a result Moody included a "no-fault termination" provision in the employment agreement, Shawn could still have undertaken employment at Action Gaming. Moody did not rescind Shawn's future employment, nor did he terminate Shawn without cause. Rather, Shawn himself decided not to accept employment and is unable to show he suffered actual damages. Therefore, Defendant is entitled to summary judgment on Plaintiffs' fourth claim for relief.

2.   <u>Lena Van Asdale</u>

Plaintiff Lena Van Asdale alleges that Defendant knew of her contractual arrangement with Walker Digital and intentionally interfered with that arrangement. (Pls.' Compl. 19.) Defendant argues that Lena is unable to establish IGT's knowledge of her contract with Walker Digital, IGT's intent to interfere, IGT's actual disruption of the contract, or resulting damage. (Def.'s Mot. for Summ. J. 24.)

Following her termination from IGT in March 2004, Lena obtained employment with

Walker Digital in September 2004. (Pls.' Compl. 12-13.) On October 12, 2004, IGT sent a letter to the President and COO of Walker Digital. (Pls.' Compl. Ex. A.) The stated purpose of the letter was "to inform [Walker Digital] of IGT's relationship with Lena Van Asdale and to inquire as to her relationship with Walker Digital." (*Id.*) The letter describes Lena's duration of employment at IGT, the nature of her employment, and her access to sensitive information IGT believed she was precluded from disclosing. (*Id.*) IGT asked for confirmation of whether Walker Digital had any relationship with Lena, a description of that relationship if it existed, and any other information Walker Digital was willing to provide regarding its dealings with Lena. (*Id.*) On October 12, 2004, IGT also sent a letter to Lena informing her of its concern that she was employed by Walker Digital and its belief that her employment created a conflict. (Pls.' Compl. Ex. A.) With its letter to Lena, IGT enclosed, among other things, a copy of the letter sent to Walker Digitial's President and COO. (*Id.*)

In her complaint, Lena alleges that Defendant engaged in retaliatory conduct by sending the letter to Walker Digital and demanding that she not be allowed to work for Walker Digital. (*Id.* at 19.) In her opposition to summary judgment, however, Lena asserts that her termination was also a result of Defendant's involvement with Walker Digital. (Pls.' Opp. to Summ. J. 37.) In February 2006, Defendant acquired an equity interest in a company that holds, develops, and licenses Walker Digital's intellectual property identified for gambling use. (*Id.*, Ex. K.) After this development, Lena asserts that she was initially reassigned to work in the lottery area of Walker Digital, but that as Defendant's involvement with the company increased, she was eventually terminated in September 2006 due to the lack of gaming-industry related work available to her at Walker Digital. (*Id.*) Although Lena has not moved to amend her complaint so that it contains the additional allegation she raises in her opposition to summary judgment, the court will consider it in its summary judgment analysis.

Defendant argues that Lena's claim suffers from multiple deficiencies, primarily, the lack of evidence showing IGT caused actual disruption of her contractual relationship or that she suffered resulting damage. (Def.'s Mot. for Summ. J. 24-26; Def.'s Reply 17 (Doc. #183).) With

10

regard to the letter, Defendant argues that Lena admits that after Walker Digital received the letter from IGT, she was not terminated, her pay was not reduced, she did not receive a lesser bonus, and she was not monetarily damaged by IGT's actions. (Def.'s Mot. For Summ. J. 25-26.) Defendant contends that Lena cannot identify any actual interference with her contract or any damage she suffered from IGT's alleged interference by sending the letter to Walker Digital. (*Id*. at 26.) After thoroughly reviewing the evidence, the court agrees. (*See* Def.'s Mot. For Summ. J., Campbell Decl., Ex. 1 at 129-30.)

With regard to IGT's acquisition of an equity interest in the company associated with Walker Digital, Defendant argues that Lena presents no evidence that it was involved in the decision to reassign her to work in the lottery area or that it was involved in her termination. (Def.'s Reply 17.) Defendant contends that, in fact, Lena admits that Walker Digital had a legitimate business reason for terminating her: the lack of gaming-industry related work available to her at Walker Digital. (*Id*.) Lena, however, argues that Walker Digital terminated her employment directly as a result of IGT's involvement with Walker Digital. (Pls.' Opp. to Summ. J. 37.) Lena relies on her declaration in support of her position. (*Id*., Ex. K.) Although Lena contends that IGT's increased role with the company associated with Walker Digital led to her termination, she fails to provide evidence, in her declaration or otherwise, showing that IGT took specific actions directly leading to her termination.   Because Lena is unable to produce evidence showing that Defendant actually disrupted her contractual relationship with Walker Digital, Defendant is entitled to summary judgment on Plaintiffs' sixth claim for relief.

**D.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM**

Plaintiffs claim that during the time surrounding their terminations, Defendant intentionally caused Plaintiffs to suffer emotional distress. (Pls.' Compl. 20-21.) Defendant moves for summary judgment arguing that Plaintiffs are unable to establish any of the three elements necessary for a claim of intentional infliction of emotional distress. (Def.'s Mot. for Summ. J. 27.)

/ / /

1   To establish a claim for intentional infliction of emotions distress, a plaintiff must show:
2   "(1) extreme and outrageous conduct with either the intention of, of reckless disregard for,
3   causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional
4   distress and (3) actual or proximate causation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382,
5   1386 (Nev. 1998).

6   On December 17, 2003, Shawn was diagnosed with cancer, and on December 19, 2003,
7   he underwent surgery to remove a malignant tumor. (Pls.' Opp. to Summ. J., Ex. K at 2.)
8   According to Shawn, in early January 2004, he informed Dave Johnson that although he was
9   still recovering, he would still have to go through radiation therapy. (*Id.*) Shawn alleges that
10  Johnson encouraged him "to take a couple of weeks off and rest," in part because of his recent
11  surgery, but also because Shawn believed Johnson "wanted him out of the office." (Pls.' Opp.
12  to Summ. J., Ex. C at 302-3.) In Shawn's view, Johnson suggested Shawn take time out of the
13  office so that Johnson could conceal a meeting he was trying to set up with Barry Irwin, IGT's
14  outside litigation counsel. (*Id.*) Shawn alleges that Johnson used the meeting with Irwin to
15  attempt to amass pretextual reasons for terminating Shawn. (Pls.' Opp. to Summ. J. 39.)
16  According to Shawn, Johnson falsely represented to him that his superiors were dissatisfied
17  with his performance, and that he might have to find another job within the company. (Pls.'
18  Compl. 20.) Shawn alleges that although Johnson informed him on January 21, 2004, that he
19  would be terminated, Johnson waited until February 11, 2004, the day Shawn was scheduled
20  to begin radiation therapy, to terminate him. (Pls.' Opp. to Summ. J. 39.)

21  Shawn contends that Johnson used Shawn's health as a weapon in severance
22  negotiations by suggesting that Shawn would lose his health insurance unless he accepted the
23  severance. (*Id.* at 39-40.) After their terminations, Shawn and Lena allege that IGT imposed
24  a "gag order" on all IGT employees, which included virtually all of the Van Asdales's friends.
25  (*Id.* at 39.) As further evidence of IGT's behavior, the Van Asdales point to an email from
26  Johnson to IGT's Human Resources Director in which Johnson (1) suggested that the Van
27  Asdales had circulated a rumor that Shawn had terminal cancer, (2) stated that he didn't "really

28  12

care, unless Shawn really is terminal," and (3) suggested that IGT give the Van Asdales a severance proposal and give them the weekend to accept or reject it. (Pls.' Opp. to Summ. J., Ex. N, Ex. 36.) On March 16, 2004, IGT's Human Resources Director emailed the Van Asdales IGT's severance offers and told the Van Asdales to "[t]ake it and run." (Pls.' Opp. to Summ. J., Ex. M.)

Plaintiffs assert that viewing the facts in the light most favorable to them gives rise to the inference that IGT's actions were outrageous, intentional, and caused damages. (Pls.' Opp. to Summ. J. 40.) Plaintiffs contend that because the level of outrage was high, Plaintiffs need not show that the resultant emotional distress they suffered gave rise to physical injury. (*Id.*) Defendant argues that termination, by itself, is not extreme and outrageous behavior, and that Plaintiffs fail to show that IGT engaged in any extreme and outrageous conduct. (Def.'s Reply 19.) Defendant asserts that the Plaintiffs claims of depression without physical injury are insufficient to constitute severe emotional distress, and that Plaintiffs cannot demonstrate that IGT's actions were the cause of any emotional distress they suffered. (Def.'s Mot. for Summ. J. 27-29; Def.'s Reply 19-20.)

To satisfy the first element of a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant engaged in extreme and outrageous conduct. *Barmettler,* 956 P.2d at 1386. "[T]ermination of employees … does not in itself amount to extreme and outrageous conduct actionable under an intentional infliction of emotional distress theory." *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993). Liability results only in "extreme cases where the actions of the defendant goes beyond all possible bounds of decency [and] is atrocious and utterly intolerable." *Id.* Whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery is a question for the court. *Id.* In this case, Defendant's actions and behavior surrounding Plaintiffs' terminations fall well short of the necessary extreme behavior. Plaintiffs' termination alone does not rise to the level of outrageous and extreme. Viewing the evidence in the light most favorable to the Van Asdales, the Court cannot find that either Johnson's

actions and comments or the HR Director's actions and comments were so extreme and so outrageous as to warrant a claim for infliction of emotional distress.

To satisfy the second element of a claim for intentional infliction of emotional distress, a plaintiff must show he or she suffered severe emotional distress. *Barmettler,* 956 P.2d at 1386. "[T]he stress must be so severe and of such intensity that no reasonable person could be expected to endure it." *Hirschhorn v. Sizzler Restaurants Int'l*, 913 F. Supp. 1393, 1401 (D. Nev. 1995). Additionally, the less extreme the outrage, the more important it is to require evidence of physical injury or illness from emotional distress. *Id*. "[G]eneral physical or emotional discomfort are insufficient to satisfy the physical impact requirement." *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 483 (Nev. 1993). Here, as discussed above, Defendant's conduct fails to reach the level of extreme and outrageous, thus, Plaintiffs must show evidence of physical injury or illness from emotional distress. Shawn's doctor diagnosed him as having "an adjustment disorder with features of anxiety and depression." (Def.'s Mot. for Summ. J., Campbell Decl., Ex. 8 at 17.) Lena's doctor diagnosed her as having "borderline clinical depression." (*Id*., Ex. 7 at 19-20.) Plaintiffs have failed to produce evidence showing they suffered physical injury or illness from emotional distress. Consequently, the court, while sympathetic to the Plaintiffs, cannot find that their diagnoses amounts to severe emotional distress. Because Plaintiffs fail to produce evidence to meet the first or second element to support a claim for intentional infliction of emotional distress, Defendant is entitled to summary judgment on Plaintiffs sixth claim for relief.

### E. AFTER-ACQUIRED EVIDENCE

Defendant argues that Shawn's damages should be limited by the after-acquired evidence doctrine for any claim that proceeds to trial. (Def.'s Mot. for Summ. J. 29.) Shawn contends that the after-acquired evidence doctrine is inapplicable under the facts of this case. (Pls.' Opp. to Summ. J. 41-42.)

"The after-acquired evidence doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later discovers evidence of wrongdoing that

14

would have led to the employee's termination had the employer known of the misconduct." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070-71 (9th Cir. 2004)(internal quotations omitted). For the doctrine to apply, an employer must prove by a preponderance of the evidence that it would have terminated the employee for the misconduct. *Id.* The burden is on the employer to "establish not only that it *could* have fired an employee for the later-discovered misconduct, but that it *would* in fact have done so." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996)(citations omitted)(emphasis in original). The employer's actual employment practices, not just the standards established in its employee manuals, are the focus of the inquiry. *Id.* Application of the after-acquired evidence doctrine "generally limits an employee's remedy in three significant ways": (1) the employer does not have to offer reinstatement, (2) the employer does not have to provide front pay, and (3) the employer only has to provide back pay "from he date of the unlawful discharge to the date the new information was discovered." *O'Day*, 79 F.3d at 759 (citations omitted).

During Shawn's deposition, Defendant learned that Shawn had secretly recorded four of his conversations with IGT executives. (Def.'s Mot. for Summ. J., Johnson Delc., ¶ 4.) According to Shawn, on January 16, 2004, Richard Pennington told him that if he continued pressing for an investigation into the nondisclosure of documents he would be fired. (Pls.' Opp. to Summ. J., Ex. C at 315-16.) This conversation prompted Shawn to record his conversation with Pennington on January 19, 2004. (*Id.*) Additionally, Shawn states that because of the "prolonged stonewalling" he perceived from Dave Johnson and because Johnson had "lied to [him] on a number of occasions," he decided to record his conversations with Johnson on January 21, 2004, and February 11, 2004. (*Id.* at 265, 315.) Shawn also recorded a conversation he had with Bob Bittman in January 2004. (*Id.* at 265.) Shawn did not disclose to any of these individuals that he was recording their conversations and no other IGT employees were aware that he was recording conversations. (Defs.' Mot. for Summ. J., Campbell Decl., Ex. 2 at 266, 281.) Shawn states that he recorded the four conversations in furtherance of his own investigation into the nondisclosure of documents. (Pls.' Opp. to Summ.

15

J., Ex. E at 3.) Shawn asserts that undertook his own investigation because he felt it "was [his] duty to IGT to investigate the wrongdoing that IGT's officers – all former Anchor officers – refused to investigate." (*Id*. at 4.)

Defendant argues that it would have terminated Shawn for secretly recording his conversations with Pennington, Johnson, and Bittman. (Def.'s Mot. for Summ. J. 30.) Defendant contends that Shawn breached his ethical duties as IGT's attorney and that it would have terminated his employment on this ground alone had it discovered them during his employment. (*Id*.) Defendant submits the declaration of Dave Johnson in support of its position that IGT would have ended Shawn's employment based entirely on his secret recording of four conversations. (Def.'s Mot. for Summ. J., Johnson Decl., ¶ 4.) However, this lone piece of evidence does not amount to a preponderance of the evidence justifying application of the after-acquired evidence doctrine. In contrast to Defendant's position, Shawn's deposition testimony indicates that he may have recorded the conversations in furtherance, not in violation, of his ethical duties as IGT's attorney. Johnson's declaration supports the conclusion that Shawn breached an ethical duty to IGT, while Shawn's declaration indicates he acted because of his ethical duty. With the evidence pointing in opposite directions, it becomes critical that it is Defendant's burden to show that the after-acquired evidence doctrine should apply. Although Defendant adamantly asserts that Shawn's recordings would have resulted in immediate termination, it fails to adequately substantiate by a preponderance of the evidence that his actions were of such severity. The court finds that Defendant has failed to show by a preponderance of the evidence that it would have fired Shawn for secretly recording conversations. Thus, the after-acquired evidence doctrine is inapplicable.

/ / /

/ / /

/ / /

/ / /

### III. CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion For Summary Judgment (Doc. #173) is **GRANTED** in part and **DENIED** in part as follows:

    1)    Summary judgment on Claims II-VI is **GRANTED**.

    2)    Summary judgment on application of the after-acquired evidence doctrine is **DENIED**.

DATED: December 8, 2009.

_____
UNITED STATES MAGISTRATE JUDGE