```
        FILED              RECEIVED
        ENTERED            SERVED
              COUNSEL/PARTIES OF RECORD

              MAY 24 2011

           CLERK US DISTRICT COURT
              DISTRICT OF NEVADA
        BY:                      DEPUTY
```

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

SHAWN VAN ASDALE, an individual, ) 3:04-cv-00703-RAM
and LENA VAN ASDALE, an individual, )
      Plaintiffs, )
)  **MEMORANDUM DECISION AND**
vs. ) **ORDER**
)
INTERNATIONAL GAME , )
TECHNOLOGY, a Nevada corporation, )
)
      Defendant. )

Before the court is Defendant, International Game Technology, a Nevada corporation's (IGT), Renewed Motion for Judgment as a Matter of Law. (Doc. # 342.)[1] Plaintiffs, Shawn Van Asdale and Lena Van Asdale (Plaintiffs), opposed (Doc. # 345) and IGT replied (Doc. # 348). Also before the court is IGT's Motion for New Trial or Remittitur. (Doc. # 343.) Plaintiffs opposed (Doc. # 346) and IGT replied (Doc. # 347). After a thorough review, the court denies both motions.

## I. BACKGROUND

Plaintiffs, Shawn Van Asdale and Lena Van Asdale (Plaintiffs)[2], husband and wife, are former corporate counsel for Defendant, International Game Technology, a Nevada corporation (IGT). (Pls.' Compl. (Doc. # 3) 3.) IGT specializes in the design, development, manufacturing, distribution and sales of computerized gaming machines and systems products. (IGT's Mot. for Summ. J. (Doc. # 173) 6.) Plaintiffs filed their Complaint against IGT on December 1, 2004,

---

[1] Refers to court's docket number.

[2] The court may refer to Plaintiffs individually as Shawn and Lena.

asserting a claim for whistleblower protection relief under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A (SOX), and state law claims for tortious discharge, intentional interference with contractual relations, retaliation, and intentional infliction of emotional distress. (Doc. #3.)[3] Plaintiffs' Complaint asserts that top management at Anchor Gaming (Anchor) stood to make millions of dollars, personally, if IGT acquired Anchor by a merger which was based primarily on Anchor's "Wheel of Gold" patents (Wheel Patents). (*Id.*) They allege that Anchor withheld vital information about the Wheel Patents from IGT and its intellectual property department, including prior art that would have invalidated a patent IGT sought to litigate. (*Id.*) Plaintiffs assert that they met with IGT management, consisting of former Anchor management, to express their concern about the withholding of this information, and were terminated in retaliation for their whistleblowing activities. (*Id.*)

A jury trial was held from January 26, 2011 through February 8, 2011 on Plaintiffs' SOX claim.[4] On February 7, 2011, IGT filed its Motion for Judgment as a Matter of Law, which the court denied. (*See* Doc. #310 and Doc. #311.) The trial resulted in a verdict in favor of Plaintiffs. The jury awarded actual damages in the amount of $955,597 to Shawn and $1,270,303 to Lena. (Doc. # 316 and Doc. # 317.) Judgment was entered on February 9, 2011. (*See* Doc. # 321.) IGT filed its Renewed Motion for Judgment as a Matter of Law and Motion for New Trial or Remittitur on March 9, 2011. (Doc. # 342 and Doc. # 343.)

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. LEGAL STANDARD

Under Rule 50(b), if the court denies a motion for judgment as a matter of law under Rule 50(a), "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for new trial under Rule 59." Fed.R.Civ.P. 50(b). A Rule 50(b) motion "is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion."

---

[3] Prior to filing their Complaint, Plaintiffs filed and voluntarily dismissed a formal complaint before the Secretary of Labor pursuant to SOX. (Doc. # 3 at ¶ 60.)

[4] The court granted summary judgment as to the state law claims. (*See* Doc. # 235.)

2

*E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). For that reason, a party cannot raise arguments in a post-trial Rule 50(b) motion that it did not raise in its pre-verdict Rule 50(a) motion. *Id.* (citation omitted). However, "[r]ule 50(b) may be satisfied by an ambiguous or inartfully made motion under Rule 50(a)." *Id.* (internal quotation marks and citation omitted).

If there is substantial evidence to support a jury verdict, the court must deny a motion for judgment as a matter of law. *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994); *see also Wallace*, 479 F.3d at 624. Notably, "the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Id.* Moreover, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

## B. DISCUSSION

### 1. Timeliness

Plaintiffs argue that IGT's motion is untimely. (Doc. # 345 2-3.) A Rule 50(b) motion must be filed within 28 days after entry of judgment. Fed.R.Civ.P. 50(b). Here, judgment was entered on February 9, 2011. (*See* Doc. # 321.) The last day for IGT to file a renewed motion for judgment as a matter of law was Wednesday March 9, 2011. IGT did file its motion, in the same document as a motion for new trial, on March 8, 2008 (*see* Doc. # 340), and it was re-filed as a separate document on March 9, 2011 (Doc. # 342). Therefore, IGT's motion was timely filed. (*See* Doc. # 340-342.)

### 2. Causation

IGT argues that Plaintiffs failed to establish causation--that any alleged protected activity was a contributing factor in their termination. (Doc. # 342 7.) Specifically, IGT argues that while Plaintiffs may have testified that they reported suspicions of shareholder fraud to Sara

3

1  Beth Brown (Brown) and Richard Pennington (Pennington), the decision to terminate was made
2  by Dave Johnson (Johnson), and there is no evidence in the record to support the conclusion
3  that Johnson was aware of Plaintiffs' conversations about their suspicions. (*Id.*)

4        Plaintiffs counter that Shawn testified that he told Pennington about the pre-merger
5  nondisclosure of the Australian Flyer, its potential for fraud during the merger, that he thought
6  Mark Hettinger (Hettinger) was involved, and it could go to the top. (Doc. # 345 4.) Plaintiffs
7  point out that IGT did not call Pennington to testify at trial, and Johnson testified that he spoke
8  with Pennington about Shawn before the November 24, 2003 meeting with Shawn and Lena,
9  and he talked with Pennington about Shawn's performance issues. (*Id.* at 4-5.) Johnson also
10 testified that he made the decision to fire Shawn three days after Plaintiffs told him about the
11 nondisclosure of the Australian flyer. (*Id.* at 6.)

12       Regulations promulgated by the Department of Labor set forth four required elements
13 of a prima facie case under SOX: (a) "[t]he employee engaged in a protected activity or conduct";
14 (b) "[t]he named person knew or suspected, actually or constructively, that the employee
15 engaged in the protected activity"; (c) "[t]he employee suffered an unfavorable personnel
16 action"; and (d) "[t]he circumstances were sufficient to raise the inference that the protected
17 activity was a contributing factor in the unfavorable action." 29 C.F.R. § 1980.104(b)(1)(i)-(iv).

18       The court agrees with Plaintiffs that when viewed in the light most favorable to them,
19 the testimony at trial provides substantial evidence from which the jury could reasonably
20 conclude that the communications to Pennington and Johnson were a contributing factor in
21 Plaintiffs' termination.

22       Shawn was hired by IGT in January 2001 as Associate General Counsel. (Trial transcript
23 (Tr.) 93-96 (Doc. # 328).) He received a positive performance evaluation in 2002, exceeding
24 expectations. (Tr. 118:23-25, 119:1-21 (Doc. # 328).) In his first year at IGT, no problems were
25 brought to his attention concerning his performance. (Tr. 120:8-10 (Doc. # 328).) In August
26 2002, Shawn was promoted to Director of Strategic Development, receiving an increase in salary
27 and additional stock options. (Tr. 120:11-25 (Doc. # 328).) At that time, he was also made Co-
28

4

1 | Head of the Intellectual Property Department with Lena. (Tr. 122:23-25, 123:1-6 (Doc. # 328).)
2 | Brown, IGT's General Counsel at the time, prepared his 2003 performance review, and he
3 | received a raise. (Tr. 141:23-25, 142:1-24 (Doc. # 329).) At the end of 2003, he also received
4 | an additional grant of shares of IGT stock, approved by Johnson. (Tr. 121:20-25, 122:1-15 (Doc.
5 | # 328).)

6 | Lena started at IGT as Associate General Counsel in January 2001. (Tr. 8:10-14 (Doc.
7 | # 333).) She received a good first performance evaluation with no complaints. (Tr: 13: 1-4 (Doc.
8 | #333).) She was promoted to Co-Head of the Intellectual Property Department around April
9 | 2003, and received a raise, bonus, and stock options. (Tr. 13:5-10, 19:21-25, 20:1-8 (Doc.
10 | #333).)

11 | The Australian Flyer was first brought to Plaintiffs' attention on August 12, 2003. (Tr.
12 | 56:17-25, 57:1-10 (Doc. # 333), Tr. 228-233 (Doc. # 329).) After learning of the existence of
13 | the Australian Flyer, Shawn testified that he had conversations with Pennington where he told
14 | Pennington that it was his firm belief that IGT was defrauded in the merger through Anchor,
15 | and specifically Hettinger not providing the Australian Flyer documents. (Tr. 240:20-25, 24-
16 | 242:1, 275:11-17 (Doc. # 329), Tr. 386:4-23 (Doc. # 330).) According to Shawn, Pennington
17 | agreed that the merger had been fraudulent, that T.J. Matthews had been involved, and that
18 | if they had received these documents they could not have gone forward with the merger. (Tr.
19 | 275: 18-23 (Doc. # 329).) Shawn also testified that Pennington told him that if he kept pressing
20 | for an investigation, he would be fired, and if anyone ever asked Pennington what he thought,
21 | he would deny everything. (Tr. 275:24-25, 276:1-2 (Doc. # 329).) At that time, Pennington
22 | was a key employee in a leadership position at IGT. (Tr. 242:18-25, 243:1-9 (Doc. # 329).)

23 | Johnson began his employment as General Counsel of IGT on November 3, 2003,
24 | replacing Brown. (Tr. 637:17-21 (Doc. #331).) He was previously General Counsel at Anchor.
25 | (Tr. 637:22-25 (Doc. #331).)

26 | Shawn and Lena met with Johnson on November 24, 2003. (Tr. 258:21-25, 259:1-10
27 | (Doc. #329), Tr. 691:14-17 (Doc. # 331).) Johnson admits that they indicated that Hettinger

5

1  engaged in some sort of bad behavior with respect to the nondisclosure of the Australian Flyer,
2  but testified that it was presented as a problem in connection with the patent office application,
3  and did not have anything to do with shareholder fraud. (Tr. 698:13-25, 700:9-13 (Doc. #331),
4  Tr. 815:19-25, 816:1-7 (Doc. #332).)

5  On the other hand, Shawn testified that he indicated to Johnson that the nondisclosure
6  raised concerns of a potential for fraud on the shareholders, although he admittedly did not use
7  the specific phrase "fraud on the shareholders." (Tr. 260:2-261:1-6, 262:4-6 (Doc. # 329).)
8  Instead, he testified that he relayed to Johnson his suspicions regarding Hettinger's
9  involvement-- that Hettinger initially stated that he had a copy of the Australian Flyer and had
10 sent it to Shawn, and later claimed he did not have a copy of the Australian Flyer but had told
11 Shawn about it. (Tr. 260: 2-10 (Doc. # 329).) According to Shawn, he told Johnson that the
12 Australian Flyer had not been provided to him in the due diligence, and there appeared to be
13 at least a potential for fraud and a need for an investigation. (Tr. 260: 11-19 (Doc. # 329).)
14 He told Johnson that he did not believe Hettinger acted alone, and Joe Walkowski was at least
15 involved because he had suspiciously come up with the Australian Flyer documents in such a
16 short time. (Tr. 260:20-25, 261:1-6 (Doc. # 329).) Shawn reiterated that in the November 24,
17 2003 meeting with Johnson, "[t]he only type of fraud that we were talking about was the per-
18 merger activity, so that would have been a merger that was accomplished through fraud." (Tr.
19 262:11-15 (Doc. #329).) Fraud on the patent office was also subsequently discussed in the
20 meeting. (Tr. 262:16-23 (Doc. # 329).)

21 Lena testified that during the November 24, 2003 meeting with Johnson, they discussed,
22 among other things, how the Australian Flyer came about, and that an investigation needed to
23 be conducted into why these documents had not been disclosed pre-merger. (Tr. 67- 68:2-11
24 (Doc. #333).) They also discussed the potential for fraud on the patent office in this meeting.
25 (Tr. 70:15-23 (Doc. # 333).)

26 According to Johnson, he decided to terminate Shawn Van Asdale three days after the
27 November 24, 2003 meeting, but delayed the termination until after the holidays. (Tr. 263:15-

28

6

19 (Doc. # 329), Tr. 716: 6-25 (Doc. #331).) Shawn testified that he had not been told by Johnson at the November 24, 2003 meeting that Johnson had any concerns with his performance, and Shawn was not given any indication that his job was in jeopardy. (Tr. 263:20-25 (Doc. # 329).)

In December 2003, Shawn traveled to Chicago, Japan, and Australia for IGT. (Tr. 269:12-19 (Doc. # 329).) He got sick while he was in Australia and subsequently found out that he had cancer. (Tr. 271:9-13 (Doc. # 329).) When he returned to Reno from Australia, he went to the doctor, and did not return to work on a full-time basis until January 2004. (Tr. 271:14-19 (Doc. # 329).) In late January, in a meeting with Johnson, Shawn was told he was being terminated. (Tr. 276:21-25 (Doc. # 329), Tr. 734:19-25, 735:1 (Doc. #332).) Shawn's official termination date was February 11, 2004. (Tr. 447:18-21 (Doc. #330).) About a month later, in mid-March 2004, Lena was terminated. (Tr. 296:11-13 (Doc. # 329), Tr. 77:20-25 (Doc. #333).)

Construing the evidence in favor of Plaintiffs, as it must, the court finds that a jury hearing Plaintiffs' testimony set forth above could have reasonably concluded that the communications with Pennington and Johnson contributed to their termination.

First, there was substantial evidence presented concerning Plaintiffs version of the November 24, 2003 meeting and the jury could have reasonably believed Plaintiffs' version of events over Johnson's. Plaintiffs' testimony about the November meeting is consistent with Shawn's testimony of his conversations with Pennington and the conversation he and Lena had with Brown, where they clearly suggested that the Australian Flyer was wrongfully withheld during the merger process. The jury also could have concluded that Johnson did communicate with Pennington concerning Plaintiffs' allegations of shareholder fraud. While Johnson testified that he did not have this conversation (Tr. 826:9-13 (Doc. #332)), Shawn testified that he told Pennington of the potential for shareholder fraud and that it could go all the way to the top, and Johnson testified that he spoke with Pennington before the November meeting. (Tr. 275:11-23 (Doc. #329), Tr. 807:17-20 (Doc. # 332).)

Second, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Van Asdale*, 577 F.3d at 1003 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (causation could be inferred where adverse employment action took place less than three months after protected activity). Here, Johnson testified that he made the decision to terminate Shawn just three days after the November 24, 2003 meeting. (Tr. 263:15-19, Doc. # 329, Tr. 716: 6-25, Doc. #331.) Lena was terminated several weeks after Shawn's official termination date. Moreover, up until the time of their termination, Shawn and Lena received favorable performance reviews and promotions. (*See* Tr. 73:19-23, Doc. #333.)

Finally, the overall factual circumstances presented at trial add to the substantial evidence supporting a conclusion by the jury that the protected activity contributed to Plaintiffs' termination. Plaintiffs told Brown and Pennington that Hettinger, and possibly T.J. Matthews, may have been involved in the pre-merger nondisclosure of the Australian Flyer. Plaintiffs testified that they discussed the potential for fraud during the merger with Johnson. Johnson was General Counsel at Anchor prior to the merger and worked with T.J. Matthews and Hettinger. T.J. Matthews became CEO of IGT after the merger, and replaced Brown with Johnson as General Counsel of IGT. Johnson made the decision to terminate Shawn just three days after they told him of the suspicious nature of the pre-merger nondisclosure of the Australian Flyer, and then weeks after Shawn was terminated, made the decision to terminate Lena. While IGT presented evidence at trial that Shawn was terminated for poor job performance, this was at odds with the evidence concerning Shawn's performance reviews and promotions, and the testimony of witnesses such as Mr. Greenslade, who works for IGT's competitor, Aristocrat. Similarly, with respect to Lena, while IGT presented evidence that she was terminated for requesting access to sensitive information related to "Class 2" gaming, Lena testified that she accessed this information in the normal course of her work, and that this was merely a pretext for her termination.

8

In sum, the court finds there was substantial evidence for the jury, believing Plaintiffs' version of events, to conclude that the protected activity was a contributing factor in their terminations.

### 3. Protected Activity

#### a. Definitive and specific reporting of shareholder fraud

IGT argues that Plaintiffs failed to establish they definitively and specifically reported shareholder fraud because: (1) Shawn's testimony is inconsistent with his declaration submitted in support of Plaintiffs' opposition to IGT's motion for summary judgment; (2) Plaintiffs never told Johnson that their suspicions regarding the Australian Flyer related to an allegation of shareholder fraud; and (3) Johnson was not aware of any allegation of fraud on the shareholders. (Doc. #342 8-15.)

Plaintiffs assert that they did definitively and specifically report shareholder fraud. (Doc. #345 7-11.) First, Plaintiffs point out that IGT offered Shawn's declaration into evidence, it was admitted, and IGT never remarked about any discrepancy between the declaration and Shawn's testimony at trial. (*Id.* at 7.) Second, Plaintiffs assert that the jury could have understood Plaintiffs' reporting to Johnson to have been definitive and specific. (*Id.* at 8.) Third, Plaintiffs take the position that Johnson's claim he was not aware of an allegation of fraud on the shareholders was simply unbelievable. (*Id.* at 9-11.)

To constitute protected activity under SOX, an "employee's communications must 'definitively and specifically' relate to [one] of the listed categories of fraud or securities violations under 18 U.S.C. [ ] § 1514A(a)(1)." *Van Asdale v. International Game Technology*, 577 F.3d 989, 996-97 (9th Cir. 2009). The court finds that there was substantial evidence for the jury to conclude that Plaintiffs' communications to Johnson related, definitively and specifically, to shareholder fraud.

Johnson testified that nothing in the November 24th meeting with the Van Asdales indicated to him that they were complaining about shareholder fraud. (Tr. 815:19-25, 816:1-7 (Doc. # 332).) He testified that Shawn indicated to him that Hettinger engaged in some sort

of bad behavior with respect to the nondisclosure of the Australian Flyer, but it was in the context of a discussion regarding the problem this would present with the patent application. (Tr. 695:15-23, 700:9-13 (Doc. # 331).)

Shawn testified that during the November 24, 2003 meeting, he discussed the fact that the Australian Flyer "had not been produced during the pre-merger due diligence to O'Melveny Myers, and the documents had not been produced in the pre-merger time frame to [himself] through Mark Hettinger..." (Tr. 408:13-18 (Doc. # 330).) He told Johnson "there was a potential for fraud" when they were discussing the fact that the Australian Flyer had not been disclosed to in the pre-merger time frame. (Tr. 409:9-19 (Doc. #330).) He admits he did not use the word "shareholders," but insisted he was taking with Johnson "about the potential for fraud during the merger." (Tr. 409:20-24 (Doc. # 330).) When asked on cross-examination whether he said "there was a potential for fraud during the merger," Shawn responded, "I don't recall exactly if it was potential for fraud during the merger, or this happened during the merger and there was a potential for fraud. But, they would have been closely linked." (Tr. 410:2-8 (Doc. # 330).) He explained that while he did not use the term "shareholder fraud," they were discussing the merger of Anchor and IGT and testified that if IGT was defrauded in the merger, then its shareholders were, by definition, defrauded. (Tr. 411:16-22 (Doc. # 330).) He went on to state that because Johnson was a lawyer, it was not necessary for him to use the specific words "shareholder fraud," meaning that it would be clear to an attorney that if a corporation was defrauded or tricked into going through with a merger, then by definition, the corporate shareholders would have also been defrauded. (Tr. 411:23-25, 412:1-17 (Doc. # 330).)

On cross-examination, IGT's counsel asked Shawn about the declaration he made in support of Plaintiffs' opposition to IGT's motion for summary judgment. (*See* Tr. 419:11-14 (Doc. #330).) IGT's counsel specifically referenced and read paragraph 4 of the declaration, which states:

> I testified at my deposition that the non-disclosure implicated a potential for fraud. IGT's counsel did not ask me what I meant by the use of that phrase and, instead, focused only on the fraud, on the Patent Office aspect. Had he inquired,

10

> I would have testified consistently with what I told Sara Brown and Rich Pennington; i.e., there was also a potential for fraud on the shareholders that needed to be investigated.

(Tr. 419:19-25, 420:1-4 (Doc. # 330).) The declaration was admitted into evidence on IGT's motion. (Tr. 422:20-25 (Doc. # 330).) The declaration is not inconsistent with his testimony at trial. Shawn testified at trial that he discussed with Johnson the circumstances of the Australian Flyer's production and Mark Hettinger's involvement. This is consistent with his claim in his declaration that he was talking about possible fraud concerning the merger between IGT and Anchor. His testimony that he did not use the word "shareholders," but he was talking with Johnson "about the potential for fraud during the merger" is consistent with his declaration statement that he would have testified that there was a potential for fraud on the shareholders that needed to be investigated. In addition, his declaration is consistent with his testimony concerning his conversations with Brown and Pennington wherein he suggested that the Australian Flyer had been wrongfully withheld prior to the merger.

Lena testified that in the November meeting, they discussed, among other things, how the Australian Flyer came about and that they thought an investigation needed to be conducted into why these documents had not been disclosed pre-merger. (Tr. 67:4-13 (Doc. #333).) She testified that they gave Mr. Johnson the facts surrounding how they found out about the Australian Flyer, that Mark Hettinger had been involved, and that he kept changing his story. (Tr. 67:14-24 (Doc. # 333).) She told Johnson that it was important to find out why the documents were not given to IGT before the merger. (Tr. 68:2-11 (Doc. #333).)

The court recognizes that there was conflicting testimony at trial concerning the communications made by Plaintiffs to Johnson, but it was up to the jury to determine whose version of events it believed. Taking the evidence in the light most favorable to Plaintiffs, Shawn and Lena's testimony was sufficient to support a finding by the jury that their communications to Johnson definitively and specifically related to shareholder fraud.

///
///

11

### b. Subjective belief

IGT argues Plaintiffs did not subjectively believe shareholder fraud occurred because: (1) Plaintiffs testified at trial that they had only a suspicion of a potential for fraud; and (2) Plaintiffs' allegations were made in bad faith because they sought a severance package after their termination and Shawn sold stock prior to his termination. (Doc. #342 15-18.)

First, Plaintiffs argue that they were not required to prove that shareholder fraud actually occurred, only that the conduct being reported, the nondisclosure of the Australian Flyer, related to fraud against the shareholders. (Doc. #345 11.) Second, Plaintiffs assert that they were only required to show that they reasonably believed there might have been a fraud and were fired for even suggesting further inquiry. (*Id.* at 11-12.) Third, Plaintiffs argue that IGT's suggestion that they acted in bad faith by trying to enter into a severance agreement lacks merit, and should not be considered because it was not raised in IGT's Rule 50(a) motion. (*Id.* at 14.)

Plaintiffs were required to prove that they had "a subjective belief that the conduct being reported violated a listed law." *Van Asdale*, 577 F.3d at 1000-10001 (citations omitted). "The legislative history of Sarbanes-Oxley makes clear that its protections were 'intended to include all good faith and reasonable reporting of fraud, and [that] there should be no presumption that reporting is otherwise, absent specific evidence.'" *Id.* at 1002 (citing 148 Cong. Rec. S7418-01, S7420 (daily ed. July 26, 2002) (statement of Sen. Leahy)). The Ninth Circuit clarified: "Requiring an employee to essentially prove the existence of fraud before suggesting the need for an investigation would hardly be consistent with Congress's goal of encouraging disclosure." *Id.* Taking the evidence in the light most favorable to Plaintiffs, the court finds there is substantial evidence to support a conclusion by the jury that Plaintiffs had a subjective belief that the conduct being reported, i.e., the nondisclosure of the Australian Flyer, related to shareholder fraud.

Plaintiffs testified that the manner of production of the Australian Flyer was suspicious because Walkowski had previously been asked to send his entire file to Marty Hirsch, but for some reason had ready access to these documents and was able to produce them in a matter of

minutes. (Tr. 235:17-25, 236:1-12 (Doc. #329), Tr. 58:5-11, 60:9-19 (Doc. # 333).) After being asked when he first thought that the non-disclosure could have been deliberate and that there was a potential for fraud, Shawn responded, "almost immediately." (Tr. 236:13-18 (Doc. # 329).) Plaintiffs also testified about Hettinger's involvement. (Tr. 237:6-8 (Doc. # 329), Tr. 62-64:1-11 (Doc. # 333).) Shawn discussed the nondisclosure of the Australian Flyer with Pennington, and the fact that he was disturbed that it had not been produced prior to the merger. (Tr. 241:17-21 (Doc. # 329).) He and Lena then discussed with Brown the highly suspicious nature in which the Australian Flyer was produced, and that it had not been provided in the pre-merger due diligence. (Tr. 243:17-23, 244:1-6 (Doc. # 329).) They testified that they discussed the possibility that there was a problem with the merger, that there was a potential for fraud with the merger, and questioned whether Hettinger acted alone. (Tr. 244:7-15 (Doc. # 329), Tr. 68:24-25, 69:1-16 (Doc. #333).) Shawn testified that by the time he met with Johnson on November 24th, he had formed an opinion that the nondisclosure was suspicious, there could be a problem with the merger, and it could go to the top. (Tr. 258:24-25, 259:1-7 (Doc. # 329).) Lena testified she had a personal belief something fraudulent occurred, and although she did not know for sure, an investigation needed to be conducted because the documents were not produced prior to the merger and could impact the value of the patents that IGT paid a billion dollars to acquire. (Tr. 69:17-25, 70:1-3 (Doc. # 333).)

Regarding, IGT's argument that Plaintiffs could not have had a subjective belief because they tried to enter into a severance agreement and sold stock before their termination, the court finds that IGT did not raise this argument in its Rule 50(a) motion. IGT stated generally, in its Rule 50(a) motion, that Plaintiffs are required to prove they had a good-faith, subjective belief that the conduct they were reporting violated the listed law (Doc. # 348 7), but IGT did not argue anywhere in its motion that Plaintiffs did not have a good faith belief because they tried to enter into a severance agreement and sold stock prior to their termination. (*See* Doc. # 310 4-5.) Instead, IGT's argument focused on the claim that Plaintiffs could not have formed a subjective belief without further inquiry into the alleged non-disclosure of the Australian Flyer materials

13

before the merger. (*Id.* at 4.) Because IGT did not raise this argument in its Rule 50(a) motion, it is not properly raised in the instant motion. *See Go Daddy Software, Inc.*, 581 F.3d at 961.

### c. Objectively reasonable belief

IGT argues any belief of shareholder fraud by Plaintiffs could not have been objectively reasonable because: (1) Plaintiffs had no factual basis to believe IGT shareholders were harmed because they could not know whether impairment of the value of the Wheel Patents in the merger was possible; (2) Plaintiffs communications did not approximate a securities fraud claim because they lacked the scienter and loss elements; and (3) it was not reasonable for Plaintiffs to report this to Johnson as a potential wrongdoer. (Doc. # 342 18-24.)

First, Plaintiffs argue that IGT did not raise the argument that the Van Asdales' belief was not objectively reasonable in their Rule 50(a) motion. (Doc. # 345 14-15.) Second, Plaintiffs assert there is ample evidence that the Van Asdales' beliefs were objectively reasonable. (*Id.* at 14-16.) Third, Plaintiffs assert that they were not required to show harm to the shareholders, but did because they elicited testimony that IGT spent $1.4 Billion to acquire the Wheel Patents, IGT sued Bally and lost, and IGT's stock price went from $70 down to $7 under T.J. Matthew's leadership. (*Id.* at 16.) Finally, Plaintiffs argue that they followed an appropriate course in reporting the potential for fraud to Johnson, after reporting it to Brown and Pennington. (*Id.* at 17.)

Preliminarily, IGT did briefly mention the argument that Plaintiffs did not have an objectively reasonable belief of pre-merger shareholder fraud in their Rule 50(a) motion. (*See* Doc. #348 8, Doc. # 310 4:16-22.)

Plaintiffs were required to prove that they had an objectively reasonable belief that shareholder fraud occurred. *Van Asdale*, 577 F.3d at 1000-1001. "[T]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud." *Id.* (internal quotations and citations omitted). "A private action for securities fraud 'resembles, but is not identical to, common-law tort actions for deceit and misrepresentation,' and [ ] its elements

14

1  include a material misrepresentation or omission, scienter, a connection with the purchase or
2  sale of a security, reliance, economic loss, and loss causation." *Id.* (citing *Dura Pharms., Inc.*
3  *v. Broudo*, 544 U.S. 336, 341-42 (2005)). To establish that Plaintiffs had an objectively
4  reasonable belief of shareholder fraud, they were required to have a theory of fraud
5  approximating a securities fraud claim, but were not required to prove that securities fraud
6  actually occurred. *See Van Asdale*, 577 F.3d at 1001 ("It is not critical to the Van Asdales' claim
7  that they prove that Anchor officials actually engaged in fraud in connection with the merger;
8  rather, the Van Asdale's only need show that they reasonably believed that there might have been
9  fraud and were fired for even suggesting further inquiry.").

10       The court finds there was substantial evidence for the jury to conclude that Plaintiffs'
11 belief was objectively reasonable. First, IGT's argument that Plaintiffs were attorneys and not
12 accountants, and therefore "could not know whether any impairment of the value given to the
13 Wheel Patents in the merger would be possible without discussing the issue with someone with
14 the requisite financial background" is simply untenable. (*See* Doc. # 342 19-20.) There is ample
15 testimony in the record regarding the value of the Wheel Patents, and it is clear that the Wheel
16 Patents were the primary reason for the merger with Anchor. Johnson described the Wheel
17 Patents as the "crown jewel" of IGT's intellectual property portfolio. (Tr. 709: 3-9 (Doc. # 331).)
18 Johnson also testified that he was aware that if there were problems with the Wheel Patents
19 before the merger, it could affect the outcome of the merger. (Tr. 668:23-25, 669:1 (Doc. #
20 331).) Shawn and Lena both testified about the value of the Wheel Patents and that they were
21 the primary reason for the merger. (Tr. 60:9-19 71:15-21 (Doc. # 333).) They also testified that
22 they thought the non-disclosure could have been deliberate. (Tr. 701:15-21 (Doc. #333).) Shawn
23 testified that Pennington told him if the Australian Flyer had been disclosed, they could not have
24 gone through with the merger. (Tr. 275:18-23 (Doc. # 329).) Taking this information along with
25 the fact that top management at IGT, which included former Anchor officials, had an alleged
26 financial interest in the nondisclosure, the court finds the jury had substantial evidence from
27 which to conclude that Shawn and Lena's belief was objectively reasonable.

28

1    Finally, the court agrees that Plaintiffs followed an appropriate course in reporting the
2 potential for fraud to Johnson, after reporting it to Brown and Pennington. Their reporting to
3 Johnson does not render their belief objectively unreasonable.

### III. MOTION FOR NEW TRIAL OR REMITTITUR

**A. LEGAL STANDARD**

Under Rule 59, "[a] court may, on motion, grant a new trial to all or some of the issues- and to any party-...(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Rather, the court is "bound by those grounds that have been historically recognized." *Id.* "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Id.* (citation omitted).

Courts apply a lower standard of proof to motions for new trial than they do to motions for judgment as a matter of law. A verdict may be support by substantial evidence, yet still be against the clear weight of evidence. *Molski*, 481 F.3d at 729. Unlike a motion for judgment as a matter of law, in addressing a motion for new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Id.* Instead, if, "having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed," then the motion should be granted. *Id.* at 1371-72. However, a motion for new trial should not be granted "simply because the court would have arrived at a different verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *U.S. v. 40 Acres*, 175 F.3d 1133, 1139 (9th Cir. 1999). The court should uphold a jury's award of damages unless the award is based on speculation or guesswork. *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992).

1  Under Rule 59(a), the court may grant a motion for remittitur if the jury award was
2  against the weight of the evidence. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S.
3  525 (1958); Fed.R.Civ.P. 59(a); *see also Fenner v. Dependable Trucking, Co., Inc.*, 716 F.2d 589,
4  603 (9th Cir. 1983) (where court determines damage award is excessive, court may grant the
5  motion for new trial or deny the motion conditional on the acceptance of a remittitur).

6  "[D]enial of a motion for new trial is reversible 'only if the record contains no evidence
7  in support of the verdict' or if the district court 'made a mistake of law.'" *Go Daddy Software,*
8  *Inc.*, 581 F.3d 951, 962 (9th Cir. 2009) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th
9  Cir. 2007) (internal quotation marks and citations omitted)).

10 **B. DISCUSSION**

11  **1. Timeliness**

12  Plaintiffs argue that IGT's motion is untimely. (Doc. # 346 2.) Like a renewed motion
13 for judgment as a matter of law, a motion for new trial must be filed no later than 28 days after
14 the entry of judgment. Fed.R.Civ.P. 59(b). Judgment was entered on February 9, 2011. (*See*
15 Doc. # 321.) IGT originally filed its motion in the same document as the renewed motion for
16 judgment as a matter of law on March 8, 2011. (Doc. # 340.) IGT refiled the motion in a separate
17 document on March 9, 2011. (Doc. # 342.) IGT's motion is timely.

18  **2. Summary of argument**

19  IGT challenges the jury award to Shawn Van Asdale in the amount of $955,597, which
20 appears to correlate with his purported loss of stock options, because it argues that the
21 uncontroverted evidence showed he failed to mitigate his damages. (Doc. # 343 4-7.)

22  Plaintiffs argue that IGT's mere speculation as to what the jury awarded Shawn is not an
23 adequate basis for a new trial or remittitur. (Doc. # 346 1.) In addition, Plaintiffs argue that even
24 if the only component of the jury award to Shawn Van Asdale was lost stock options, those were
25 included in the definition of backpay in the jury instructions, and IGT waived any objection to
26 that jury instruction. (*Id.* at 1-2.) Finally, Plaintiffs assert that IGT's speculation regarding the
27 jury's understanding of Dr. Cargill's testimony is without merit. (*Id.* at 5-6.)

28

17

### 3. Analysis

The court finds no basis for a new trial. First, while IGT argues that there was uncontroverted evidence that Shawn failed to mitigate his damages by not accepting the job at Action Gaming, Shawn testified about the circumstances of his rejection of the job. Shawn testified that he would have had to relocate to Las Vegas for this job, and that after he signed an employment agreement, Ernie Moody wanted to include a provision that Shawn could be terminated for cause, which was defined as including friction with IGT, and he was certain things would become difficult between IGT and Action. (Tr. 302:14-25, 303:1-8 (Doc. # 329).) It was up to the jury to determine whether Shawn Van Asdale acted reasonably in not accepting this job. (*See* Doc. # 315, Jury Instruction No. 21A.) Based on this testimony, the jury could have concluded that there was no failure to mitigate.

Second, Jury Instruction No. 21 states:

> If you find for a plaintiff on his or her Sarbanes-Oxley claim, you must determine each plaintiff's damages. A plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate a plaintiff for any monetary loss resulting from defendant's conduct. You should consider the following:
>
> Back pay, including the reasonable value of earnings, employment opportunities, benefits and stock options lost to the present time.
>
> It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

(Doc. # 315.)

The instruction clearly includes lost stock options as an element of Plaintiffs' backpay. IGT did not object to this instruction. Nor did IGT object to the general verdict form. IGT's suggestion that it objected to the general verdict form by agreeing in theory to a special verdict form proposed by Plaintiffs is counterfactual. (*See* Doc. # 347 2.) IGT's Supplemental Objection to Plaintiffs' Jury Instructions (Doc. # 294) contains the heading, "OBJECTION TO SPECIAL VERDICT FORM," and indicates that IGT did not object to the concept of using a special verdict form, but wanted to expand it to coincide with the elements of a SOX claim and account for mitigation of damages. (Doc. # 294 3.) While IGT may have sought to add additional items to

18

Plaintiffs' proposed special verdict form, the record does not contain an objection to the general verdict form used by the court.

Finally, while the amount awarded to Shawn appears to correlate with the amount of his lost stock options set forth by Dr. Cargill, nothing in the verdict form suggests precisely how the jury calculated the award.

To conclude, the court simply cannot speculate regarding the jury's conclusion on the categorization of damages. There was sufficient evidence for the jury to conclude that Shawn acted reasonably in not taking the job with Action Gaming, and in that case the jury would not have considered the $2.6 million as mitigation in its damages calculation. An award of lost stock options as an element of backpay was within the jury's purview under SOX. Therefore, the court finds that the evidence presented to the jury supports its award.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that IGT's Renewed Motion for Judgment as a Matter of Law (Doc. # 342) is **DENIED**.

**IT IS HEREBY FURTHER ORDERED** that IGT's Motion for New Trial or Remittitur (Doc. # 343) is **DENIED**.

DATED: May 24, 2011

_____
UNITED STATES MAGISTRATE JUDGE